LAURA KNEPPER, now LAURA KNEPPER HUCK-
LEBERRY, Appellant, v. FRANK KNEPPER,
Respondent.

### Kansas City Court of Appeals, November 15, 1909.

1. **DIVORCE: Custody of Children: Review of Decree.** A decree
of divorce granting the custody of a female child to the mother
will not be modified and the custody of the child given to the
father, unless it clearly appears that the mother is morally
depraved and manifests a strong disposition to evil.

2. ———: ———: ———: **Moral Depravity.** A single transgres-
sion of the moral law does not necessarily betoken depravity.
A person is depraved when he is generally bad, is wicked in
mind and heart, loves evil rather than good, and though a
single act of adultery may be considered strong evidence of
depravity, it is not conclusive.

Appeal from Carroll Circuit Court.—*Hon. John P. But-
ler,* Judge.

REVERSED.

*J. F. Graham* and *Jones & Conkling* for appellant.

(1) The evidence is insufficient to support the
judgment on the petition for review, it not being shown
that appellant was an unfit or improper person to have
the care and custody of said minor child. Jennings v.
Jennings, 85 Mo. App. 290; Brown v. Brown, 53 Mo.
App. 453; Clarkson v. Clarkson, 22 Mo. App. 253; Mes-
senger v. Messenger, 56 Mo. 337; Million v. Million,
106 Mo. App. 683; Cole v. Cole, 89 Mo. App. 228; Salis-
bury v. Salisbury, 92 Mo. 683; Childs v. Childs, 11 Mo.
App. 395; Nave v. Nave, 28 Mo. App. 505; Hyatt v.
Wolfe, 22 Mo. App. 191; Campbell v. Garton, 29 Mo.
343; Tennison v. Tennison, 49 Mo. 110; State ex rel. v.
Scott, 104 Mo. 26. (2) It was improper to tax the
cost incident to the petition for review to appellant.
The petition for review alleged matters which were

Knepper v. Knepper.

heard and adjudicated in the divorce proceeding. Deidesheimer v. Deidesheimer, 74 Mo. App. 234; Cole v. Cole, 89 Mo. App. 228.

*Lozier, Morris & Atwood* for respondent.

Appellant's first point is that the evidence is insufficient to support the judgment modifying the former decree as to the custody of the said minor child. In reply to this, we say that if it is possible to produce evidence justifying the modification of a decree of this character, such evidence has been produced in this case. The conduct of appellant has been so outrageous and abhorrent as to shock all sense of decency and respectability. To permit the child Allie, since she has arrived at the age when she does no longer need the physical nurture of her mother, to remain in such a morally corrupt association, would be a crime against enlightened society, and would amount to the moral assassination of an innocent and helpless ward of the court. The testimony overwhelmingly shows that the conduct of the mother has been so morally corrupt that the people of her vicinity have ostracized her and her family from society. The admissions she makes as to registering and occupying rooms with Huckleberry at two different hotels prior to her marriage with him, shows by all well-recognized principles of evidence that she is an adulteress. She admits that she and Huckleberry occupied together a room with but one bed in it, all night. It is true she swears that nothing improper transpired but that is simply adding the crime of perjury to the crime of adultery. If such evidence as this record discloses is not sufficient to support the judgment of the trial court in taking a child from such morally vicious surroundings and environment, what in the name of decency could a mother do to forfeit her right to the custody of her off-spring when they are passing through the impressionable period of young maidenhood.

JOHNSON, J.—The issue before us is raised by the divorced parents of Allie Knepper, a female minor, now eleven years old. The appeal is prosecuted by the mother from a judgment modifying the decree of divorce in which the custody of the child was awarded the mother. After their marriage, the parties lived together as husband and wife until February 15, 1907, when they separated and plaintiff with their two minor children, a boy and a girl, established her home at Bosworth. Before the separation, the parties lived on a farm south of Bosworth. They sold the farm to J. C. Huckleberry and also disposed of their personal property preparatory to the separation. On the 15th of February, 1907, they entered into a written contract by the terms of which they agreed to live apart and settled all questions relating to the division of their property. That contract contained the agreement that the mother should have the custody of the children for two years after which she should retain the little girl and the boy should go to the father. Plaintiff then instituted the present suit. In the petition she alleged certain indignities committed against her by defendant and prayed for a divorce and for the custody of the children, but did not pray for alimony. Defendant filed an answer and cross petition in which he alleged acts of misconduct on the part of plaintiff, chiefly acts which if true inculpated plaintiff with Huckleberry. When the cause came to trial in September, 1907, plaintiff dismissed her petition, the court heard the evidence introduced by defendant and decreed "that the defendant, Frank Knepper, be divorced from the bonds of matrimony contracted with the plaintiff, Laura Knepper, and be forever freed from the obligations of said marriage; it is further ordered that plaintiff, Laura Knepper, have the care and custody of Allie Knepper, minor child born of said marriage, and that defendant have the care and custody of Warren Knepper, minor child born of said marriage, and that each party pay one half the costs."

On March 18, 1908, defendant filed a petition for review in which he prays that he be given the custody of the daughter on the ground of the moral turpitude of the mother, and alleges that since the decree of divorce was rendered, plaintiff has been guilty of immoral conduct with Huckleberry. A trial of the issues presented by this petition and plaintiff's reply resulted in a judgment awarding the custody of the child to defendant "on condition that the latter obtain a suitable home for said child and shall pay the necessary expenses for its maintenance; it further appearing that said Frank Knepper has secured a home for said child at the home of Richard Morris and that said Richard Morris and wife are suitable persons to have the care and custody of said child." It is provided that the children shall be permitted to visit plaintiff once every month and that plaintiff may visit them on suitable occasions.

The evidence adduced by defendant tends to establish the following facts: Defendant and Huckleberry were neighboring farmers, Huckleberry became a frequent visitor at defendant's home and an intimacy sprang up between him and Mrs. Knepper. Defendant's history of this relation does not reflect credit on him. To the hour of the separation he outwardly preserved a friendly attitude toward the man he now claims defiled his home. Most of the visits of Huckleberry were either on the express or implied invitation of defendant. The excuse offered for such complaisance is that defendant was so cowed by his wife that he acquiesced in her plans for the companionship of Huckleberry even when his mind had become charged with suspicion that his wife's affections were being alienated from him. After the separation, Huckleberry frequently called on Mrs. Knepper at her home in Bosworth. Neighbors saw his horse or team hitched in front of the house and the tongue of gossip wagged furiously. In the following January, Huckleberry and Mrs. Knepper left Bosworth to be married in Kentucky. They went to Carrollton

by different trains and boarded a train at Carrollton
for St. Louis where they arrived at eleven o'clock at
night. They went to a hotel and Huckleberry regis-
tered them as husband and wife. They went to the room
assigned them where, according to the testimony of
plaintiff, Huckleberry remained for an hour "talking
business" with her and then went to another hotel. The
next night they spent at a hotel in Louisville and again
Huckleberry registered them as man and wife. Plaintiff
says she permitted her companion to remain in the room
that night because she was ill and besides she "knew
how to take care of herself." The next day they were
married and after visiting relatives in Kentucky, they
returned to Bosworth and went to live on the farm
Huckleberry had purchased from defendant. Defend-
ant introduced a great number of witnesses who testi-
fied that plaintiff's reputation for chastity in Bosworth
and vicinity is bad, but without exception each admit-
ted that this reputation is based solely on plaintiff's
conduct with her present husband. The evidence is over-
whelming that with the exception of this conduct, plain-
tiff always has behaved with propriety and that since
her marriage with Huckleberry she has been faithful
to her husband and child. She and the little girl are
full of affection for each other, the mother has support-
ed the child in a manner befitting their station, has sent
her to school and to Sunday school, has given her in-
struction in music and in general has surrounded her
with the comforts and blessings of a mother's love.
Further, it appears beyond dispute that Huckleberry
is a hard-working, sober farmer who, but for the offense
of courting another man's wife, has lived an uneventful
and blameless life. He is in fairly good circumstances
and appears to be able and willing to provide a good
home for the child. On the other hand, defendant,
though able to support his children, has no home and
must, perforce, entrust them to the care of others.

This child is the ward of the court and her welfare is the paramount consideration. The State is her parent and its will as pronounced by the court will override the desires and feelings of the warring natural parents and will do for the child that which will best serve to promote her true welfare. If we thought the mother so depraved that the moral nature of the child would be contaminated by unwholesome environment, we would not hestitate to tear the child from her for its own good. The feelings of the parents should be considered, in such cases, but only as a subordinate consideration. What will best serve the little girl whose destiny will be so greatly affected by our decision? The father, certainly, is far from being an attractive personage. He stood by with his eyes open and watched another man win the heart of his wife, without offering even a word of protest, and now pleads his own weakness as an excuse for such unmanly conduct. He believed his wife unfaithful when he entered into the contract of separation and yet in the face of that belief, agreed that she might keep the little girl. He even sold his homestead to his despoiler. Evidently he thought more of his property interests than he did of the welfare of his child. It is true this contract could not bind the courts, but it does bring into strong relief the character of the man who asks us to disregard his attempt to contract away his child and to give him its custody though he believed as much against the character of his wife when he made that contract as he knows now. Moreover, he has no home, does not propose to establish one and will do no better than to pay the board of the child in some one else's home—a poor prospect, indeed, for a girl of tender years who most of all needs the moral and physical nourishment of a mother's love. We find ourselves unable to avoid the conclusion that defendant is not actuated so much by parental solicitude for the well being of the child as he is by a motive of revenge against his former wife. That motive obtrudes throughout the record and

we shall have to find the mother's conduct so bad as to denote depravity, i. e., an inherent deficiency of moral sense and rectitude before we shall give our consent to the affirmance of a judgment that would give a tender girl into the keeping of such a father.

The cross petition for a divorce alleges many acts of misconduct on the part of plaintiff with Huckleberry, but it does not specifically charge her with adultery, and we shall assume from this omission that the decree given defendant does not necessarily include the finding that plaintiff was an adulteress. Turning to the evidence in the record before us, we find ample proof of the fact that before the separation plaintiff was guilty of the grave offense against the marital relation of receiving and reciprocating the attentions of a man other than her husband, but we do not believe she went to the length of committing adultery. When her affections became alienated from her husband, evidently she became possessed of the purpose of being divorced and of contracting marriage with Huckleberry who was in a position to marry her. Such conduct cannot be reprobated too strongly. The law exacts fidelity to the marital relation and though we believe defendant stupidly contributed to the demolition of his home, we find plaintiff was guilty of a flagrant outrage against the most sacred of human institutions. Further, we find that while on her way to be married to Huckleberry, she was guilty of immoral conduct at the hotels where they stopped in St. Louis and Louisville. Her attempted exculpatory excuses will not go. "Finding persons in such a situation as presumes guilt generally, courts must presume it in all cases attended with those circumstances." [Jennings v. Jennings, 85 Mo. App. 290.]

We have stated everything of consequence that reflects on the moral character of plaintiff. An attempt was made to show an improper relation between her and a married man at Bosworth, but the attempt fell flat. Stress was also laid on the fact that she associated with

a woman of questionable character in Bosworth, but it turned out that she merely employed the woman to work for her while she was ill. The woman was engaged in domestic service and had been employed by and received in the homes of respectable people including some of the accusing witnesses. There is nothing in that incident to cast reproach on plaintiff. We find in her an entire absence of immoral conduct and propensity except in the matter of her relation with her present husband. Before the beginning of that relation she lived the life of a good woman and since her marriage has held herself beyond reproach.

Counsel for defendant invoke the general rule applicable to an adulterous mother in cases of this character. It has been said that "A woman who has been guilty of adultery is unfit to have the care and education of children, and more especially of female children." [2 Bishop on Marriage, Divorce and Separation, sec. 1198.] But in the same paragraph the author says: "A single act of adultery not repeated and not likely to be, whether by father or mother, has been deemed not necessarily to deprive forever the delinquent of the custody." In the case of In re Steele, 107 Mo. App. 567, much relied on by defendant, we said: "The relator has been shown to be guilty of adultery and though she is the mother, yet her abhorrent conduct of itself, affords the strongest reasons for refusing her application for the custody, society and association of the child."

But the facts in that case differ in material respects from those before us and indicated to us that the mother was morally depraved. A single transgression of the moral law does not necessarily betoken depravity. A person is depraved when he is generally bad, is wicked in mind and heart, loves evil rather than good, and though a single act of adultery may be considered strong evidence of depravity it is not conclusive. We are disposed to regard the relation of plaintiff with her present husband prior to their marriage as a single trans-

Knepper v. Knepper.

gression and not as the manifestation of a disposition to evil. We believe she is a good woman at heart and a good mother and that her transgression was due not to wantonness, but to a passion weakly resisted and suffered to grow and ripen by the fatuous conduct of defendant. Now that she is married and is leading a good life, we think her mother love which appears to be strong will assert itself and that the child will not be surrounded by a morally impure atmosphere. We shall leave the child for the present with her, believing that the benign results of a mother's care and love will be greater than any evil influence likely to be born of the mother's past offense. But we place plaintiff on probation and should she backslide again, it will be at the cost of losing her child.

In answer to the argument that the social ostracism of plaintiff will include the child, we find that this exclusion from respectable social intercourse is not so extensive as counsel describe it. Many good citizens of Bosworth appeared as witnesses for plaintiff and defended her. Further, it appears that the vulture gossip has picked the bones of this scandal clean, and it is reasonable to presume it will turn to other carrion—of which, unhappily, a sufficient supply is never wanting. We perceive no reasons for thinking the child will be deprived of healthful companionship.

The judgment is reversed. All concur.