JOHN O. SANDERS, APPELLANT, v. LEOTA G. SANDERS, RESPONDENT.*

Springfield Court of Appeals. Opinion filed February 20, 1929.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2853, p. 880, n. 93; Divorce, 19CJ, section 442, p. 178, n. 99; section 795, p. 343, n. 10; section 805, p. 348, n. 79, 80; section 808, p. 349, n. 13; section 810, p. 350, n. 38; p. 351, n. 42; section 811, p. 353, n. 73, 75, 76, 78; section 823, p. 361, n. 27.

836

*John O. Sanders, pro se.*

*D. H. Kemp* for respondent.

BAILEY, J.—This is a statutory proceeding to modify a decree of divorce as to the custody of two minor children born of the marriage heretofore contracted between plaintiff and defendant. Judgment was for defendant granting to her their care and custody, and plaintiff has appealed.

The decree of divorce was obtained by John O. Sanders, March 18, 1924. At that time Leota G. Sanders, defendant and respondent herein, was living separate and apart from plaintiff John O. Sanders, in the State of Maryland. Constructive service was had on her by publication. She was not present at the trial and had no knowledge of the divorce proceedings until after the divorce was granted. The circuit court of Barry county, in its decree severing the bonds of matrimony, gave the care and custody of the two children to plaintiff, although they were at that time in the State of Maryland with their mother, the defendant, and apparently had never been in this State.

Plaintiff first questions the sufficiency of the motion to modify the divorce decree. It is asserted that the motion fails to set up any new facts or changed conditions since the rendition of the aforesaid divorce decree and that as to other alleged circumstances, occurring prior to the decree, the matter is *res judicata*. Our courts have uniformly held that a divorce decree, from which no appeal is taken, is final and conclusive between the parties as to all matters therein adjudicated, including the disposition of the children and that, without new facts, the court is powerless to make a change in their custody. [Phipps v. Phipps, 168 Mo. App. 697, 154 S. W. 825; Sabourin v. Sabourin, 213 S. W. 490; Eaton v. Eaton, 237 S. W. 896.]

It is equally well settled that when new facts or changed conditions are pleaded and proven, the court has power to change the custody of the children, which power is never relinquished until such children attain their majority. [Meyers v. Meyers, 91 Mo. App. 151.]

We have found no case in Missouri, however, which holds, or even intimates, that the circuit court has jurisdiction to give the custody of minor children to one spouse or the other, at the time of granting a decree of divorce, when service is obtained on defendant in such suit by publication and when the children were with defendant in another state both at the time the petition was filed and when the divorce decree was entered. The courts of our sister states, almost without exception, hold that, while a decree of divorce obtained in another state upon constructive service against the defendant may be recognized insofar as the status of husband and wife is concerned, yet the court granting the decree is without jurisdiction to fix the custody of the minor children who at the time are living with the non-resident defendant and not domiciled in the State where the decree is rendered; insofar as a divorce decree, under such circumstances, attempts to fix the custody of the children, it is not entitled to recognition. [Kline v. Kline, 57 Iowa, 386, 10 N. W. 825, 42 Am. Rep. 47; Rogers v. Rogers, 56 Kan. 483, 43 Pac. 779; De La Montanya v. De La Montanya, 112 Cal. 101, 32 L. R. A. 82, 44 Pac. 345; Harris v. Harris, 115 N. C. 587, 20 S. E. 187; Seeley v. Seeley, 30 App. Cas. (D. C.) 191, 12 Ann. Cas. 1058; Mathews v. Mathews, 139 Ga. 123, 76 S. E. 855; Keenan v. Keenan, 5 Ohio N. P. (N. S.) 12; Groves v. Bartow, 109 Wash. 112, 186 Pac. 300; Griffin v. Griffin, 95 Or. 78, 187 Pac. 598.]

In line with these decisions it is our opinion that the fixing of the custody of the children by the original divorce decree in this case was beyond the jurisdiction of the court at that time, since the defendant was a non-resident and the children had never been within the confines of this State. It is therefore apparent, that the rule requiring defendant to set up new facts and circumstances showing a changed condition since the divorce, should not be strictly adhered to in the present controversy. But even granting, for the sake of argument, that this rule is applicable here, the record shows that in her motion to modify the decree defendant alleged, among other things, that on the date the decree was rendered she resided in the State of Maryland and had said minor children in her possession; that immediately after plaintiff secured the default judgment of divorce he went to the State of Maryland and to defendant's house and without authority of law, secured for a time the physical possession of John Vineyard Sanders and took him from her by force; that since that date, three different *habeas corpus* proceedings were

instituted by plaintiff in courts outside this State for said children, and that while the last such proceeding was pending, plaintiff forcibly took said children from defendant's possession, and brought them to Cassville, Missouri, where they have been since March, 1927. The foregoing portion of the motion to modify was, on motion, stricken out. However, evidence was introduced on both sides showing these very facts and it is set out here in order to give a clearer understanding of the situation of the parties.

The motion to modify further charged that since the divorce plaintiff has again married and lives at Cassville, with his second wife; that the aged mother of said wife lives with them; that neither plaintiff's second wife nor her mother have had personal responsibility in raising or caring for children; that they cannot have motherly love and patience toward said children; that plaintiff has a high and ungovernable temper and is incapable of raising the children; that he is set in his ways; that he refuses to allow the defendant to see after the dress of the children; that he is limited, in a financial way, to properly care for them; that he is trying to poison the minds of the children against her; that she is able and willing to care for the children and furnish them with a proper home. The motion contains other allegations which are of no particular importance.

We believe the motion sufficient to withstand any attack in the nature of a demurrer. Especially is that true when we hold the former attempt to fix the custody of the children was of no effect. In proceedings of this character, where the welfare of minor children is at stake, no technical rules of objection should be given serious consideration unless such motion contains no averments reasonably sufficient to confer jurisdiction. Even granting that the original divorce decree, in fixing the custody of the children, was binding and required new facts and circumstances, arising subsequent thereto, to be pleaded and proven, yet we believe the motion was sufficient to confer jurisdiction. The second marriage of plaintiff is certainly a new factor and the further allegation that the second wife is inexperienced and incapable of properly caring for the children is also a changed circumstance which might assume great importance. Plaintiff's temperament is perhaps not a new fact. But the children have grown older and, if plaintiff's temperament is such that he is incapable of properly dealing with them at their present age, that would be a new factor. In any event the trial court certainly had jurisdiction of the persons and *res* in this instance and the matter should be decided on its merits. Our statute specifically provides for review of any order touching the care, custody and maintenance of the children. [Sec. 1812, R. S. Mo. 1919.]

That important issue should not go off on the question of pleading here raised especially since no court has heretofore heard both sides

in this controversy and the court granting the divorce decree had no jurisdiction to fix the custody in the first instance. The welfare of the children demands an examination into the facts.

A case of this character requires the most careful consideration. It places upon this court a sacred responsibility, involving the welfare of two innocent children, whose whole future may depend, in a large measure, upon the correctness of our conclusions. The highway of life upon which, but a short time since, they started their journey, has led them to the fork in the road, caused by the wreck of their parents' marriage venture. It becomes our solemn duty to correctly determine, if we can, upon what road they shall continue life's journey. In making that determination we must keep in mind the compendious and salutary rule that has always been the guiding star of our courts in such matters, viz., the welfare of the children is the basis of all decisions touching their care and custody. [Knepper v. Knepper, 139 Mo. App. 493, 122 S. W. 1117; Kaplun v. Kaplun, 227 S. W. 894; Waters v. Gray, 193 S. W. 33.]

This rule has been incorporated into our statutes, which, while giving to the parents equal rights in the matter of custody, imposes upon the courts the duty to decide between them when the issue is raised, "only as the best interests of the child itself may seem to require." [Sec. 1814, R. S. Mo. 1919; Sabourin v. Sabourin, 213 S. W. 490.]

The written opinion of the trial court appearing in the record in this case, indicates he has carefully considered all the evidence and shows the decision reached was inspired by a fine consciousness of the moral and legal duty the courts must exercise for the children's welfare. We are not bound by that decision, even as to the finding of facts, but the appellate court will, in a large measure, defer to the judgment of the trial court in such matters because he had the opportunity to hear and see the witnesses and was for that reason, if for no other, in a better position to have judged of their credibility and the weight to be given their testimony. [Barnhart v. Barnhart, 253 S. W. 56.]

Where the evidence leaves any material fact in doubt we should abide by the finding of the trial court in relation thereto. [Penningroth v. Penningroth, 72 Mo. App. 329, l. c. 333.]

With the foregoing principles of law as our guide we shall consider the merits of this case.

This record contains much evidence referring to matters which occurred prior to the date of the divorce decree. In some instances objection was made thereto by plaintiff, and in other instances plaintiff himself offered the evidence. Under the view we take of this case the court committed no error in hearing this evidence which referred to matters prior to the divorce. No court having jurisdiction had

previously considered any of the circumstances or events which transpired in the lives of these people, at least from the standpoint of the children's welfare. We have held the divorce decree was of no effect insofar as it attempted to dispose of the children and in our opinion no just or proper decision could be reached which failed to take into consideration much of the matter which plaintiff asserts is *res judicata*. There can, of course, be no review of the divorce decree insofar as the severance of the bonds of matrimony are concerned. But as to the custody of the children, the case should be tried in disregard of that decree.

The question is whether the court erred in giving the care and custody of the children to defendant under the law and the evidence. The record shows that plaintiff and defendant were married November 14, 1917, in Washington, D. C. At that time plaintiff was in the diplomatic service of the United States Government. Defendant was also employed by the Government in a minor capacity. Plaintiff summed up their married life with the laconic remark that "they lived happily for twenty-eight days and fussed from then on." Mary Caroline was born in Cumberland, Maryland, August 7, 1919. Plaintiff's duties as United States Consul took him first to Bluefield, Nicaragua; then to Fort William, Canada, and finally, in 1921, to Maracaibo, Venezuela. He was present when Mary Caroline was born, having made a special trip from Central America for that purpose. While living in Canada plaintiff and defendant decided to separate and thereupon entered into a certain contract. This contract was in some respects void in law and is material only as it tends, in a measure, to indicate plaintiff's temperament. His training as a lawyer and as a diplomat seems to have imbued him with a business-like attitude and a penchant for detail and formality which asserted itself even in his family relations. This contract, while perhaps jointly prepared by plaintiff and defendant, shows it must have been written by plaintiff since no one but a lawyer could make use of such formal language. After reciting certain facts relative to the marriage, this contract continues as follows:

"The question of the custody of Mary Caroline and of the unborn child, shall be left to the court that grants the divorce of separation.

"He agrees to give her absolutely all her personal effects, including wedding presents from her relatives and friends. He agrees also that any and all legacies or other estates accruing to her shall be hers absolutely. He further agrees and binds himself, within his means, to find for her and Mary Caroline and the child expected to be born in March, 1922, for a period of two years from the birth of the expected child; provided, that if the expected child should die before it is two years old, then this obligation shall terminate three

months after its decease, or until the two-year period shall have run; provided further, if the custody of either or both of the children should be awarded to the father before the two-year period shall have run, then the finding for them, or such of them as may thus be awarded, shall be done directly by the father as such; moreover, it is understood that if she shall marry before the expiration of the two-year period as herein specified, then such event shall terminate his obligation to find for her.''

This contract was never carried out. A reconciliation was afterwards had at Cumberland, Maryland, and it was then agreed that defendant was to go to plaintiff in South America (where he had been ordered by the Government), as soon as practicable after the expected baby should arrive. John Vineyard was born in Maryland, March 23, 1922. At that time, plaintiff was in Venezuela, and had Mary Caroline with him. She was with her father for a period of eight months in all. After John was born defendant did not go to plaintiff immediately, as she agreed, but gave as a reason the state of the child's health. As a further example of plaintiff's temperament and formal attitude in his family relations we find a letter written while he was in South America, which is as follows:

''American Consular Service.

''Maracaibo, Venezuela, Feb. 22, 1923.

''LEOTA:

''I am enclosing check for $75 which may be applied to your January expenses.

''Your accounts for December, 1922, were approved in the sum of $71.95, but the remittance, as you have already been advised, is withheld pending the receipt of note for the community property diverted to your private interests. You should send in your accounts promptly if you wish to have remittances promptly.

''The $100 sent you for your incidental expenses in making the trip to this place should be placed to my credit at the First National Bank of Cumberland, since it is presumed that you will not come.

''In view of the apparent change in our marital relations from that agreed on last September, you will please show reason why I should continue to support you. Silence will be overlooked for a reasonable time, after which I will assume the right to act as may seem most proper and expedient.

''Very respectfully,

''John O. Sanders.

''Enclosure: Check No. 18, 1st Nat'l Bank., Cumb., $75.00.

''P. S. M. C. is well.''

It is a small matter but strange, that in this letter plaintiff made no reference to the baby John, who was at that time about eleven months of age, and up to that time, the father, who could not leave

his station, had never seen him. Sometime thereafter defendant did go to plaintiff at Maracaibo, taking John along. It is apparent that the father and mother were still unable to stifle their differences and their marital troubles continued. In October, 1923, the whole family returned to Washington. Then began a game of hide and seek between plaintiff and defendant which at times approached the melodramatic. In their efforts to have sole possession of the children both plaintiff and defendant resorted to trickery, force and deception. Their conduct appears to be unworthy of two people having the intelligence and character both plaintiff and defendant unquestionably possess. It seems unnecessary to detail these events. The scene of action shifted from Washington to Cumberland, Maryland; to New York and other places; exciting incidents occurred on shipboard, on railroads and in the home. Plaintiff was compelled to resign from the government service because of these troubles and finally located in Barry county, Missouri, where he has since engaged in the practice of law. *Habeas Corpus* proceedings were instituted by one or the other on three or more occasions. No decision was ever reached in these cases because the children were taken away either by defendant or plaintiff before the court reached a conclusion. Until recently defendant has managed to keep the children in her custody most of their lives, except for a period of about eight months when Mary was with her father in Venezuela. During much of that time plaintiff was not informed as to where defendant and the children were living, because, as she stated, she feared he would attempt to take them from her. In March, 1927, after plaintiff had obtained his divorce from defendant, she had the children under her care and custody in Washington, D. C. Plaintiff, after diligent search and advertisements located their place of abode. On one occasion he took the children for a walk but never returned with them. They were at that time brought to Missouri by plaintiff and have been with him in Cassville since or until these proceedings were instituted.

Coming now to the present condition of affairs, defendant came to Cassville in April, 1928, for the purpose of visiting the children. She was permitted to visit them, but later filed her motion to modify the decree now under consideration. The evidence shows both plaintiff and defendant are of good moral character. No attempt has been made by either party to prove otherwise. There also can be no question as to the excellent reputation and high moral standing of plaintiff's second wife, the stepmother of these children. She is a woman some years older than plaintiff, who is about forty-seven years of age. Her mother, past eighty years of age, lives in the home with them. There is much evidence *pro* and *con* as to how the children have been treated in their new home. This evidence deals with

their dress, cleanliness, punishment and control, with their affection for the stepmother and her affection for them. It seems unnecessary to go into detail as to these matters. We think the children have been treated reasonably well by plaintiff's wife.

Defendant testified that the present Mrs. Sanders told her (during the time defendant had the little girl in her custody under a temporary arrangement) not to bring the girl back unless she (defendant) came with her; that "Mary and John fought so she couldn't control them." Mrs. Sanders never appeared at the trial. We are uncertain as to her desires in this controversy, but since she was where her testimony could easily have been obtained, it must be accepted that the foregoing statement, credited to her, is true, since it is not denied. We do not attach great weight to that testimony, but it does tend to indicate the stepmother does not have the same sympathetic and tender attachment for these children that their natural mother undoubtedly has. Mrs. Sanders does not appear in court and join with plaintiff in his demand to retain their custody. There may be good and sufficient reasons for that state of affairs which the record does not reveal. It is only natural that the father would be more solicitous in this matter than would his present wife. We know from experience that in many instances stepmothers have shown as much love and understanding of stepchildren as could have been exhibited by their own mother. But ordinarily that is not true and, in the very nature of things, should not be true. The home plaintiff has provided for these children is a good one, but the mother who gave them birth is not there. No one can take her place.

John Vineyard is now six years of age and Mary Caroline nine. At such ages, other things being equal, they are more in need of a mother's tender love and care than any other thing in this world. [Shine v. Shine, 189 S. W. 1. c. 411; Knepper v. Knepper, 139 Mo. App. 493, 122 S. W. 1117; Ellis v. Johnson, 260 S. W. 1010.]

As they grow older conditions might be reversed and, more especially the boy, may then need the sterner, stronger discipline of the father. At the present time plaintiff must necessarily be away from his children most of the day; his business requires that. They are then left with a stepmother and her aged mother, who certainly cannot be expected to understand and care for the children as well as their own mother. As to plaintiff's temperament, we are unable to judge except as we find it from the cold pages of the record. There is some evidence tending to show he has preconceived notions about children which are somewhat lacking in sympathetic understanding. His testimony was that he is versed in child psychology. That might or might not result in benefit to the children. Psychology is a wonderful thing, but it cannot take the place of a mother's love. Nothing can.

We realize that no judgment or decree touching the custody of these children can be ideal; no arrangement or decision can fail to work some hardship; no earthly power can save these children from losing something out of their lives when the marriage ties of their parents have been broken. Until now they have lived under conditions which, to say the least, would tend to have deleterious effect on their young minds. The continuous struggle between their parents for the custody of the children should end in order that they may lead normal and healthful lives, free from being jerked hither and yon by first one and then the other. They are entitled to a permanent home with the parent under whose custody they will fare the best.

It is certainly not our province to punish or reward either parent. [Shine v. Shine, 189 S. W. 403; Fisher v. Fisher, 207 S. W. 261.]

But the evidence shows the mother is competent and amply able financially to care for these children and give them a home. That home will be without a father, it is true. That condition cannot be avoided. It is our opinion that the future welfare of the children, all things considered will best be served by awarding their custody to the mother. [Barnhart v. Barnhart, 253 S. W. 56; Phipps v. Phipps, 168 Mo. App. 697, 154 S. W. 825.]

It appears from the record that the mother's property, for the most part, consists of apartment houses located in Washington, D. C. She intends to take the children there, if given their custody. The fact that the children will be taken out of this State and removed to another jurisdiction does not present an insurmountable difficulty. When the welfare of the child demands such course, our courts have never hesitated to permit it. In Tatum v. Davis, 144 Mo. App. 125, l. c. 131, the court says: "But that the mere fact that the children are taken by the mother to reside in another state, is not an insuperable objection to her retaining their care and custody, we think there is no doubt. The test question, what is the best interest of the child, still remains." In Meredith v. Krauthoff, 191 Mo. App. 142, l. c. 187, 177 S. W. 1112, it is said that: "The divorce suit and decree therein rendered in the circuit court of Jackson county vested jurisdiction in said court to pass upon the custody of the child, and that jurisdiction continues until the boy reaches his majority. [Wald v. Wald, 168, Mo. App. 377.] Both parents were parties to the divorce suit and hence are personally bound by its decrees and orders. And those orders are controlling upon and will be recognized by the courts of other states. So that a removal of the child to Washington City is not a taking of the child beyond the jurisdiction of the court in the sense that the court would thereby lose jurisdiction to change its order in the future should subsequent events require it. The jurisdiction of the court over the child will not be ousted thereby."

.It is apparent that any subsequent order made under this continuing jurisdiction of the courts of this State, as to a child in another jurisdiction, may be difficult of enforcement. Our courts would have no power *proprio vigore* to enforce any decree as to the children living in another jurisdiction. The decisions of sister states indicate, however, a great unanimity in respecting such orders of foreign jurisdictions. At any rate, all courts ordinarily have the power to change the custody should new conditions demand it, and we find no reason for refusing to award the care and custody to the mother.

The lower court by its judgment and decree gave the care and custody of both children to defendant, Leota G. Sanders with the right of plaintiff, John O. Sanders to visit and be visited by them at reasonable times and places. We believe this judgment should be qualified to some extent.

If defendant removes these children to a distant city it will no doubt be impracticable for plaintiff to visit them except at rare intervals. His rights as a father are entitled to greater recognition. It is not proper to divide the custody between mother and father, but we believe it would be most fitting and for the best interest of the children to permit them to visit their father at his home for a period of thirty days each year during the summer vacation, commencing with 1930, provided he will pay their travelling expenses and arrange for some one to·watch over them during their journey, until they arrive at an age when they may safely travel unattended. The decree will be modified to that extent. We desire to add that the children must be encouraged to love and respect their father and communicate with him regularly by letter. Should either parent attempt to conceal from the other the whereabouts of the children or, by word or deed, undertake to poison their minds against either the father or mother, as the case might be, the parent guilty of such conduct, will forfeit all claim to the custody of said children, upon proper proof thereof. With these qualifications the judgment is affirmed. *Cox, P. J.*, concurs; *Smith, J.*, not sitting.