Petition of Johnnie W. RICE for Writ of Habeas Corpus.

Johnnie W. RICE, Petitioner,

v.

Phyllis Jean RICE, Respondent.

No. 22848.

Kansas City Court of Appeals.

Missouri.

July 16, 1958.

Opinion Modified Oct. 6, 1958.

J. T. Camblos, Charlottesville, Va., Herman Langworthy, Jr., Kent L. Thompson, Langworthy, Matz & Linde, Kansas City, Mo., for petitioner.

Austin F. Shute, Frank L. Cohn, Kansas City, Mo., for respondent.

MAUGHMER, Commissioner.

We have here a contest for custody of a girl child, who is two and a half years old. The petitioner and natural father brought this proceeding in habeas corpus to secure such custody from the respondent mother, who has had actual custody for a year and a half.

Johnnie W. Rice, the father, is 36 years of age and resides near Charlottesville, Virginia. He is presently employed doing engineering and chemical research in the atomic energy field at the University of Virginia, with a salary of approximately $5,200 per year. Once before he was married and divorced, but no children were born of that marriage. He was reared on a farm near Richmond, Virginia, and was one of a family of twelve children. He had a period of service in the armed forces and in 1954, was employed in the Kansas City area, where he met the respondent.

Phyllis Jean Rice, mother of Phyllis Jean Rice, Jr., the child in controversy, is now 25 years of age. In April, 1951, when her age was 17 years, she was married to one Peter Regusa, by whom, some seven months later, she had a child, Carla, who is completely deaf. In November, 1952, she was granted a divorce from Regusa and awarded custody of Carla. Since that divorce, Mr. Regusa has paid $40 per month to her for Carla's support. Thereafter, the respondent was again married and divorced. No children were born of her second marriage.

On January 29, 1955, petitioner and respondent were married in Kansas City. Shortly thereafter the parties moved to Virginia, where Mr. Rice had secured his present employment and entered upon the task of establishing a home. Marital disputes, disagreements and differences arose. Mrs. Rice caused her husband to be arrested on a charge of assault. The charge was dismissed without a trial. Mr. Rice sued his wife for separation and secured an injunction, restraining her from removing their child from the State of Virginia. A reconciliation was effected and the injunction dissolved. Thereafter and late in December, 1956, Mrs. Rice, accompanied by her mother, who was visiting the family, took the child Phyllis Jean Rice, Jr., who was born October 9, 1955, and returned to Kansas City, Missouri, where she has since resided with her mother and her stepfather Clare and Hazel Leslie, at 4630 East 11th Street. Shortly after she returned to Kansas City, Mrs. Rice secured employment as traffic manager and secretary for H. B. Fuller & Company in Kansas City, Missouri. She still works there with total earnings—salary and bonus—of approximately $330 per month.

Thereafter Mr. Rice filed suit in Virginia for divorce. Mrs. Rice filed an answer and cross bill. Trial was had with both parties present in person and by their attorneys. However, the minor child was never inside the State of Virginia after December, 1956. After having heard three days of testimony, the Corporation Court of the City of Charlottesville, Virginia, entered its decree from which no appeal was taken. Among other things, this judgment decreed: (1) Granted a divorce to Mr. Rice on the ground of desertion. (2) Found that Mrs. Rice was a nonresident of Virginia and had a home in Kansas City, Missouri. (3) Awarded custody of the minor child Phyllis Jean Rice, Jr. to the father, but granted to the mother the privilege of having the child visit in her home in Kansas City, Missouri for two specified periods of six weeks and four weeks in each year. The mother failed and refused to surrender actual custody of the child to the father who, on April 2, 1958, in this court, filed his petition for a writ of habeas corpus, seeking such custody.

We were and are first confronted with petitioner's claim that the decree of the Virginia court awarding custody to the father is res judicata respecting the rights of both the father and the mother as to the custody of their child, and that since this court should give full faith and credit to the judgment of a sister state court, we should enforce that judgment and deliver the child to the father in pursuance thereof, and without any separate and independent inquiry of our own.

The evidence heard in the Virginia trial shows and the Virginia decree recites that the mother was a resident of Missouri, and that the minor child was at no time after commencement of the divorce proceedings physically present in the State of Virginia. Under such facts the question arises,— Did the Virginia court have jurisdiction to determine and award custody of the child and does the decree itself affirmatively show lack of such jurisdiction and authority?

The legal issues posed by this and similar situations are discussed in the Annotation 9 A.L.R.2d, page 434, Custody Award —Child Outside the State. Three theories are therein presented and expounded. Under one the problem is treated as one of determining the conflicting rights of the parents to the custody of their child and holds that in personam jurisdiction over the parents is sufficient, irrespective of the domicile or whereabouts of the child. Under this theory, since the mother entered her appearance in the Virginia action and appeared with counsel, that court would have had authority to adjudicate custody. The second theory expressed in the Annotation is that physical presence of the child within the state is sufficient to give jurisdiction. Former United States Supreme Court Justice Cardozo, when a New York jurist, supported this view in the case of Finlay v. Finlay, 1925, 240 N.Y. 429, 148 N.E. 624, 625, 40 A.L.R. 937, when he said: "The jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the domicile of

the parents. It has its origin in the protection that is due to the incompetent or helpless. * * * For this, the residence of the child suffices, though the domicile be elsewhere". The third theory treats the question as simply one of status and as subject to the control of the courts of the state where the child is domiciled. In Restatement, Conflict of Laws, Secs. 117–118, this view is expressed with clearness and certainty. Under these last two theories the Virginia court was without jurisdiction to award custody. Its action in attempting to do so was a nullity and is not binding on this court.

 Our Missouri courts have apparently determined these questions primarily upon the basis of domicile of the child although not disclaiming jurisdiction based on the child's physical presence within the state. In Beckmann v. Beckmann, 358 Mo. 1029, 218 S.W.2d 566, our Supreme Court en banc held that the status as to custody of children was a res within the jurisdiction of Missouri courts even though such children were at the time residing in California with the father, where the father was in California only temporarily and was still legally a resident of Missouri. On page 569, of 218 S.W.2d the court said: "The jurisdiction to adjudge the status or custody of a child is ordinarily determined by his domicile. The rule has been expressed that a state can exercise through its courts jurisdiction to determine the custody of a child only if the domicile of the child is within the state. * * * Upon separation of the parents the custody of their child can be given to either parent by a court of the state of domicile of the child. * * * Expressed differently, we find the rule announced that jurisdiction to determine the custody of a child is in the courts of the state where the child legally resides. 43 C.J.S. Infants § 5". This opinion also rules that where the parents take domiciles in different states, the domicile of the child is the same as that of the parent with whom it lives. On page 569 of 218 S.W.2d the court said: "Ordi-

narily the domicile or legal residence of a minor child is the same as that of the father. But where the father and mother separate and establish different domiciles the child usually takes the domicile of the parent with whom it lives in fact. Restatement Conflict of Laws, § 30, § 32."

To the same effect is the language of the St. Louis Court of Appeals in State ex rel. Stoffey v. La Driere, 273 S.W.2d 776, loc. cit. 780: "The courts of this state possess judicial power to award the custody of children to a parent obtaining a divorce in this state, even though the children are physically absent from this state and in the custody of the other parent, provided the latter, although absent also, continues domiciled in this state. In such situation, it is ruled that the domicile of the absent children is the same as that of the absent parent who has their custody." See, also, Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458, loc. cit. 459.

██ It is our opinion and we hold that the decree of the Virginia court, insofar as it awarded custody of the minor child is not binding upon this court, that such decree in this respect shows on its face lack of jurisdiction, and that under the guise of granting full faith and credit to the judgment of sister state courts we are not required to nor should we blindly enforce that provision in the decree. Therefore, this habeas corpus proceeding having been brought initially in this court, we proceeded to hear testimony and receive evidence on behalf of petitioner and respondent so that this court could determine for itself, having in mind the best interests and welfare of the child, which of the parties should have such custody. Such a hearing was held. Petitioner and respondent were both present in person and were represented by counsel.

Petitioner offered and there was received in evidence the testimony of twelve witnesses as given in the Virginia trial. These witnesses included some of petitioner's fellow employees. They testified that he bore a good reputation, got along with his associates and that they had observed no unreasonable display of temper or anger. Two real estate salesmen who sold a house to the parties, gave their impression of Mr. and Mrs. Rice, which included nothing unusual. One of these men, at the request of Mr. Rice, talked to them as a sort of marriage counsellor, but accomplished nothing. Some neighbors and a baby sitter, who kept the child during the day while Mr. and Mrs. Rice were both working, testified. These people gave Mr. Rice a good reputation. The baby sitter, Mrs. Ossie Birkhead, said Mrs. Rice told her that "Johnnie was too old for her"; that "he beat her up" and that she threatened to kill him with a frying pan. She also said that one night when the child was sick, she tried to locate Mrs. Rice and finally found her at a motel and that Mrs. Rice came right home. She also stated that once when Johnnie had gone hunting that Mrs. Rice was angry about it and said she was going to "get even" by spending money for clothes. Some relatives of Mr. Rice also testified, including his sister, Mrs. Charles Hickman, the mother of two children, who said she and her family had agreed to move in with Mr. Rice and she would care for Phyllis Jean if Mr. Rice were granted custody. A Mr. George Burdick said he saw bruises on Mrs. Rice's arms and neck. Other witnesses saw an imprint of a shoe on Mr. Rice's back and saw bruises which he said he received from being hit by Mrs. Rice with a skillet and other articles.

Mr. Rice testified that his wife neglected the children (Phyllis Jean and his stepdaughter Carla, who was living with them part of the time) as to diet and general care; that she permitted the baby to go for hours with soiled diapers; that she allowed the baby's diapers and her own personal napkins to accumulate unwashed in the bathroom; that on occasions he had seen her take the baby's milk bottle which had dried milk in it, just rinse it out with cold water, put more milk in it and give to the

baby. He said he had to care for the children and do the housework, including preparing meals, washing dishes, bathing the children and scrubbing the floors. He charged that Mrs. Rice struck him without reason and' upon occasions threatened to kill him. He said she cursed him although he admitted that he cursed her and upon one occasion struck her. He condemned her character because she was pregnant at the time of her first marriage. He conceded that she did not drink or run around with other men.

Mrs. Emmett (Shirley) Rice, petitioner's sister-in-law, testified at the Kansas City hearing. She recounted some instances of neglect of the children. She said that she is the mother of three small children, that she lives in the farm home of petitioner's parents and has agreed to care for the minor child if petitioner gains custody. Petitioner says that if he is awarded custody he will move into this home which is located near Richmond, Virginia, and that he can secure employment in that area. This house of the grandparents Rice, where petitioner proposes to take his child, is now occupied by his parents, Mr. and Mrs. Rice, aged 79 and 76 years, by Mr. and Mrs. Emmett Rice, and their three small children, and by two nephews, who are in their teens,—in all nine persons. The house has five bedrooms and is not modern. It is 10 miles from school but busses afford transportation. Mr. Rice would plan to work in Richmond, which is 18 miles away.

Several witnesses testified on behalf of Mrs. Rice during the Kansas City hearing. Her reputation was by them described as good. They said the children appeared to be well fed, well clothed, well behaved, clean and obedient. Mrs. Rice attends church, sings in the choir, and her employer describes her as a reliable and responsible employee. Mr. Regusa, father of the older child, Carla, called as a witness by Mr. Rice, expressed the opinion that Mrs. Leslie, the mother of Mrs. Rice, was giving his child a good home. This Court observed the two children and saw no apparent evidence of neglect or mistreatment. The older girl, Carla, who is deaf, is attending a special school here in Kansas City for such handicapped children.

Since December, 1956, Mrs. Rice and the two children have been living in the home of her mother and stepfather, Mr. and Mrs. Leslie. They propose to continue to live there. Mr. and Mrs. Leslie both say they are welcome to do so. Mr. Leslie is a truck driver age 63 years. Mrs. Leslie's age is 56 years. Both appear to be in good health. Mrs. Rice contributes at least $75 per month toward maintaining the home. These five persons reside in a house located eight blocks from an elementary school. There are separate bedrooms for Mr. and Mrs. Leslie, one for Mrs. Rice, and one for the two girls. The house is modern throughout. Mr. Rice has contributed nothing for the support of his child since she was brought to Kansas City in December, 1956.

■ This court in Dawson v. Dawson, Mo.App., 241 S.W.2d 725, loc. cit. 729, said: "It has often been said that, other things being equal, the mother is best fitted to care for and guide a child through infancy and adolescence, and that such a child's interest requires that she be given custody." Many courts in this and other jurisdictions have, in effect, expressed judicially a similar opinion.

■ For the last 19 months this child, Phyllis Jean Rice, who is only 33 months of age, has resided with her mother and maternal grandmother here in Kansas City. She has apparently received adequate care. The house here is more suitable than the one in Virginia to which petitioner proposes to take her. Her home associates here include her mother, her half-sister, and her grandparents. Not even a criticism was levelled against Mrs. Leslie, who is vested with the child's daytime care for five days each week. Would it be wise to transplant this little girl from these surroundings into Virginia, where although

she could see her father oftener, her upbringing would rest mostly with her paternal aunt by marriage? There her additional associates would be her three older cousins, her aged paternal grandparents, and two grand-nephews. While we feel there are many advantages in rearing a child on a farm we do not believe it would be conducive to the welfare of this child to make the proposed change. Mrs. Emmett Rice, the aunt, who has agreed to assume the care of the child, impressed the Court as a good and proper person. We do not care to even indirectly, leave any other impression. It is our belief too that both petitioner and respondent are good citizens, and probably behave rather well, except where the other is concerned. Unreasonable behavior and criticism are often found to exist between divorced or separated persons.

Under the circumstances here it is impossible to place this child in a home where her father and mother both live. We believe the child now has a good home. She has been there for 19 months. This is an indication that it will continue to be a good home. Neither good judgment nor the welfare of the child indicates a change should be made.

It is therefore ordered, adjudged and decreed that the minor child, Phyllis Jean Rice, Jr. be and she is hereby remanded to the custody of her mother, Mrs. Phyllis Jean Rice.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court. All concur.

Modification

MAUGHMER, Commissioner.

Petitioner's motion for rehearing is overruled but the opinion heretofore entered in this cause is modified by adding thereto the following paragraph:

Petitioner, as father of the minor child Phyllis Jean Rice, Jr., is specifically granted and awarded the privilege of visiting with said child in the home of respondent from 1:00 p. m. to 5:00 p. m. on any day, but not to exceed six visits in any one calendar month. Petitioner shall not remove said child from the home and shall deport himself properly on the occasions of such visits. Respondent shall on such visits provide a room where petitioner can visit with said child in private.

SPERRY, C., concurs.

PER CURIAM.

The foregoing modified opinion of MAUGHMER, C., is adopted as the opinion of the Court. All concur.