244 S.W.2d 786 (1951)
BRAKE
v.
BRAKE.
No. 6994.
Springfield Court of Appeals, Missouri.
December 10, 1951.
*787 Hamlin & Hamlin and Haymes & Dickey, all of Springfield, for appellant.
Lincoln, Lincoln, Haseltine & Forehand, Springfield, for respondent.
McDOWELL, Judge.
This appeal is from a judgment of the Circuit Court of Greene County sustaining a motion to modify a decree of divorce relative to the care and custody of a minor child.
On the 15th day of July, 1948, appellant, James T. Brake, as plaintiff, filed an action for divorce in the Circuit Court of Greene County, Missouri, against Mabel M. Brake, respondent herein, as defendant.
The petition for divorce alleged that respondent left their home without excuse and took their minor child to Kansas City, Missouri; that she told appellant she would not live with him any more, did not love him, and was tired of married life. The petition stated that appellant attempted to get respondent to return home but she refused and stated she would never live with appellant again. The petition stated there was born of this marriage a girl, named Linda Lee Brake, age six years, who was in possession and custody of appellant, and that he is a proper person to have such custody.
The petition then prayed for a divorce and custody of the minor child.
To this petition respondent filed an answer and cross-bill for separate maintenance.
The reply pleads that respondent had been keeping company with a married man, living in Kansas City; that he secured a position for her and she took the minor child and moved to Kansas City to be with this married man.
The reply states that respondent admitted keeping company with this married man and that she was unfit to have custody of the child under the existing conditions.
Respondent's answer to this reply denied all of the allegations therein.
At the trial of the divorce action on the 16th day of November, 1948, respondent was present in the courtroom with her attorney but offered no evidence.
The trial court entered judgment for appellant which, in part, reads as follows:
"* * * and this cause coming on to be heard the said parties announce ready for trial and submit said cause to the Court for hearing; and after hearing all the evidence and being sufficiently advised of *788 and concerning the premises, the Court finds that the matters alleged in Plaintiff's petition herein are true in every respect; that the Plaintiff is the innocent and injured party and entitled to the relief prayed for in said petition.
"It is therefore considered, adjudged, ordered and decreed by the Court that the bonds of matrimony contracted by and existing between Plaintiff and Defendant be and the same are hereby dissolved, annulled and for naught held and that the Plaintiff is hereby divorced therefrom and restored to all the rights and privileges of a single and unmarried person; that the care and custody of the minor child, born of said marriage with Defendant, to-wit: Linda Lee, age six years, be and the same is hereby awarded to the Plaintiff during the school months of each year, with the Defendant to have the right of reasonable visitation with said child; that the Defendant be and is hereby awarded custody of said child during the three vacation months of each year, "with the Plaintiff to have reasonable rights of visitation with said child; that the Plaintiff pay to the Defendant $5 per week for the support of said child while the child is in the custody of the Defendant and that Defendant may have execution therefor; that the said child is not to be removed from Greene County, Missouri, without an order of this Court; * * *"
September 13, 1950, respondent filed her motion to modify this decree. In this motion she alleges that appellant was divorced from respondent on the 16th day of November, 1948, by default; that the custody of the minor, Linda Lee Brake, was given appellant during the school year and to her during the summer vacation.
The motion then alleges that this arrangement was made between appellant and respondent because respondent was working and had no place to keep the child and appellant was living with his parents and did have a place to keep her.
The motion then states that since this agreement respondent has moved to Albuquerque, New Mexico, and was, by agreement, permitted to take the minor child there during vacation; that since said divorce there has been a change in conditions, that is:
"(a) since said divorce defendant has remarried, she and her husband own their home, which is a 6-room home with bath in a good neighborhood in Albuquerque, New Mexico; that plaintiff's husband is Chief Petty Officer in the Navy, permanently stationed there; that he is willing and anxious to take said child into his home; that he has no children; that his income is sufficient to look after the educational and spiritual and other wants of said child;
"(b) that since said divorce the plaintiff has remarried, is living separate and apart from their said child, Linda Leanna, and that said child is not getting the proper care and supervision; that it has been neglected, allowed to remain filthy and unkept, has been allowed to roam in Grant Beach Park at night unattended, to wander around the neighborhood all day without any supervision, and is allowed to remain in the house where there are from five to seven adult people crowding said house and making the environment undesirable for a child of tender years to be reared."
The motion then states that it is for the best interest of the minor child that respondent be given complete custody thereof.
The trial court sustained respondent's motion to modify and entered judgment as follows:
"* * *
"It is therefore, considered, adjudged and ordered by the Court that the care and custody of the minor child, Linda Leanna Brake, be and the same is hereby awarded to the Defendant, except for the months of June and July of each year when Plaintiff is to have custody of said child; that Plaintiff is to furnish transportation to and from Springfield at the times he has custody of said child; that Plaintiff's obligation to pay the sum of $5.00 per week for the support said child while she is in the custody of defendant is retained; that each party, Plaintiff and Defendant, shall have the right of reasonable visitation with said minor *789 child while she is in the custody of the other; * * *"
In Hawkins v. Thompson, Mo.App., 210 S.W.2d 747, 751, this court states the law:
"In a case of this character, this court is not bound by the findings of the trial court but may arrive at its own conclusions from a review of the whole record and may make such findings as it deems appropriate. Rone v. Rone, Mo.App., 20 S.W.2d 545; Parks v. Cook, Mo.App., 180 S.W. 2d 64; Martin v. Martin, 233 Mo.App. 667, 125 S.W.2d 943.
"While great weight should be given to the decision of the trial court, where there is a decided conflict on questions of fact, it is still the duty of this court on appeal to render such decision as it thinks would be for the best interests of the child. * * *"
It is well settled law that only matters which have happened since the divorce hearing are competent to sustain a motion to modify. We often state that only changed conditions occurring after the divorce hearing are considered. In Hawkins v. Thompson, supra, this court, on page 751 of 210 S.W.2d, stated the law:
"Matters which happened before the divorce decree or before the hearing on the first motion to modify are res judicata and the court should be concerned only with the question whether since the rendition of those decrees there has been such a change in conditions as to materially effect the welfare of the child. As always the welfare of the child is the first and supreme consideration. The personal desires of either parent are subservient to the child's welfare. Perr v. Perr, Mo.App., 205 S.W.2d 909. A modification should be made only on the basis of such new facts. Crooks v. Crooks, Mo.App., 197 S.W.2d 678; * * *.
"A mere change in conditions alone will not justify modification. It must also be such a change as will beneficially effect the interests of the child. Irvine v. Aust, Mo.App., 193 S.W.2d 336, 342. * * *"
In Schumm v. Schumm, Mo.App., 223 S.W.2d 122, 126, the court makes the following statement of law: "* * * A provision once made becomes as conclusive as any other order or decree, and can only be modified on a showing of subsequently changed conditions. However there is this to be borne in mindthat while proof of a change in conditions is a prerequisite to the modification of a decree, such proof does not necessarily require a modification, and no modification will be made unless the welfare of the child itself requires a change in the provisions for its custody. Irvine v. Aust, Mo.App., 193 S.W.2d 336."
In Drew v. Drew, Mo.App., 186 S.W.2d 858, 868, the following principle of law is announced: "In considering the change of custody of a minor from one guardian to another in State ex rel. [Baker] v. Bird, 253 Mo. 569, loc. cit. 586, 162 S.W. 119, loc. cit. 124, Ann.Cas.1915C, 353, the Supreme Court said: `It is highly detrimental to the welfare of small children to shift them around from one family to another. * * * When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home, except for the most cogent reasons.'"
In Parks v. Cook, Mo.App., 180 S.W.2d 64, 68, the court announces the following principles of law:
"It is the duty of this court, in a proceeding of this nature, to review the evidence and render such judgment as we think is proper under the law and the evidence, even though we may reach a conclusion different from that found by the trial judge. * * *
"The law is firmly established that in determining the question of a minor child's custody, the welfare of the child is the supreme and controlling consideration. Also, where the custody of a minor child has been awarded to one parent and the other parent seeks to have the custody changed, the one seeking the change has the burden of showing that the best interests and welfare of the child will be served by making such change. * * *"
Where the custody of children is awarded in a divorce proceeding, the children become wards of the court, and it is against the policy of the law to permit their removal to another jurisdiction unless their *790 well-being and future welfare would be better served thereby. State ex rel. Shoemaker v. Hall, Mo.Sup. in banc., 257 S.W. 1047; Rone v. Rone, Mo.App., 20 S.W.2d 545; Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458; Green v. Perr, Mo.App., 238 S.W.2d 924.
Under the authorities herein set out it becomes the duty of this court to review the evidence and render such judgment as we think is proper under the law and the evidence, even though we may reach a conclusion different from that found by the trial judge.
To sustain her motion, respondent offered the testimony of three witnesses besides herself and husband, to-wit: her mother, her sister and a Mrs. Willingham.
Respondent testified, at length, and we here set out such parts of her testimony as we think pertinent to the issues involved. She testified she was married to appellant September 14, 1940, and divorced in the Circuit Court of Greene County, Missouri, September 18, 1948; that there was no contest in the divorce suit and the custody of their minor child, Linda Lee, then age six, was awarded appellant during school years and to her during vacation periods. She stated it was agreed that appellant have custody of the child because she was working and had no place to keep her and that appellant's mother had kept the child before, while she was working.
She testified she went to Albuquerque, New Mexico, February 19, 1949, and, two or three weeks thereafter, met Charles Irving Johnson, Chief Petty Officer in the United States Navy; that they were married June 10, 1949; that they have acquired a six room house with bath; that she is expecting a baby in January, 1951. She testified that her husband was permanently located, or at least they had led him to believe so, but that depended upon circumstances; that he earns about $350 a month.
She testified that when she moved to Albuquerque, appellant went with her to the trial court and got permission to take Linda, during vacation, to Albuquerque. She testified that in 1949 she came after Linda about July 1st and kept her in Albuquerque until about the middle of August or a period of six weeks; that during that period she was employed and her hours were from 5:30 p.m. until 1:30 a.m.; that her husband was also working at the time, during the day, from 7:30 a.m. until 4:15 p.m.; that he stayed with Linda after he got off work until midnight; that he cooked her supper, got her up at midnight and went for respondent; that it was necessary to do that.
She stated, on the second vacation, she had Linda from June 10, 1950, until September 1st, when her grandmother came for her and brought her back to Springfield. She testified that in 1949 she brought Linda to Oklahoma City, where appellant met her to bring her back to Springfield. She testified the reason she didn't come in 1949 for Linda until July 1st was because she couldn't get off from work. She testified that her present husband was willing to take Linda and see to her education and moral training.
She testified appellant had remarried and now lived at 700 East Elm in a three room apartment; that appellant's mother lived at 619 West Lynn and that Linda was registered in Weaver school, which is in the school district where appellant's mother lives. She admitted she had been written that appellant was attempting to get Linda registered in Weaver school and, she said, the only reason she knew for so doing was because she was staying with her grandmother.
She testified that she had no plans to go back to work after her child was born. She gave this testimony: "And you are under the impression now she is living with Grandmother Brake, is that right? A. I have beenThey probably have changed it since I filed the petition. I know she hasn't been at her grandmother's as much as she had been before that."
She testified that since she came back to Springfield, September 10, the day school started, she had seen Linda but one time and talked to her one time on the telephone. She stated she attempted to call three times but twice she couldn't get Linda; that her meeting with Linda was not at the Brake *791 home but was an accidental meeting while visiting other parties. She stated she was advised by her attorney not to see Linda.
Respondent testified that Linda had been lacking in discipline and when she or her husband would correct her, she would scream and say she wanted to go back to grandmother Brake's where she didn't have to mind.
She stated that one time she found Linda and her little girl friends in the bathroom with a part of their clothes off and when she questioned Linda she finally admitted that this had happened in Springfield with Jenny and Shirley Tindall and that her grandmother knew nothing about it. She stated Linda had wet the bed one time.
She testified Linda's table manners were bad. She stated she had no table manners at all, that she would belch and expel gas at the table and laugh. She testified she and her husband had improved Linda's manners very much and that now she always asked to be excused when she left the table. When asked if she could tell the court anything else which indicated a lack of training in the home she answered, "* * * general lack of discipline, * * *", and she then stated that Linda wouldn't eat well-balanced meals prepared for her but wanted to just eat certain things and she would bargain with her and say that if respondent would let her go to the show she would eat certain foods.
Respondent testified that at the time of the divorce, she was living in Kansas City; that her father and mother lived on a farm nine miles out; that she had two sisters, one living in Springfield and the other one in St. Louis, and she stated she had no home of her own.
Charles Irving Johnson testified he was ready and anxious to take Linda and care for her educational and moral training. He stated he was Chief Electrician Mate in the Navy and had been for sixteen years. We quote his words: "I expect to make it my career." He testified he had orders to stay in Albuquerque for at least three years and that he earned $388 a month, possessed a modern home, furnished, and transportation. He stated he knew Linda from the first time they came after her. We quote his exact words: "* * * and Linda is a wonderful girl. She is brilliant, she could really be somethingWell, she is gay and nice and kind, and everything else like that, but she does have * * * well, her table manners aren't what they should be. If you have guests or something * * * well, she just does need a little straightening out and disciplining. I am in Military Service and I consider discipline * * *"
He corroborated his wife as to Linda's table manners and her lack of discipline and he said that Linda's general attitude appeared to him that she was in the habit of bossing grown people. He testified that at one time when she came to their home she wet the bed; that he talked to her and she didn't do it any more.
He stated he was a Methodist and his wife a Baptist; that they went to the Baptist church and while Linda was with them she was kept in the Baptist Sunday School.
On cross-examination he testified he would be stationed in Albuquerque at least three years and in that time he would retire provided they didn't go to war with Russia. He stated he had known Linda during her summer vacations and then he gave this answer: "There is nothing too wrong with Linda; she is a wonderful girlbrilliant." And, in another answer, he said: "That's right, a very sweet little girl. But she does have some bad habits." He testified her manners were not what they should be and then he gave this testimony:
"Q. And being in the Navy, they are not your way and used to discipline? A. That's right.
"Q. And pretty strict discipline? A. Military discipline."
He testified he took Linda to Bingo games at his private club and that they played for prizes; that Linda was lucky and won third prize. He denied taking her to a strip tease show.
Mrs. J. H. Bonser, respondent's sister, testified that on September 11, 1950, she called Linda about 8:20 in the evening; that appellant answered the phone and stated, "She is down the street. * * * If *792 it isn't too late when she comes home I will have her call you, * * *." She testified appellant lived at 700 East Elm and that his parents live at 619 West Lynn; that she called Weaver school and learned that Linda was registered from 619 West Lynn.
Mrs. N. C. Hickman, respondent's mother, testified that after the divorce she called for Linda on one occasion, after dark, and was informed she was down the street. She stated she didn't wait until Linda came home. She testified she received a note from Linda while she was at her mother's, which was marked defendant's exhibit I. This note stated she was having a good time and hoped she could go to school there. She did not know how many people lived in the Brake home. She said it seemed there were six or eight. She didn't know how large the house was and never saw where Linda slept. This witness testified she would come for Linda on weekends, when she wasn't in school, and take her to the farm and keep her over the weekend and deliver her back to her grandparents after Sunday School on Sunday. She testified she was not too well kept; that her table manners were not good and she objected to doing things she would ask her to do. She stated the time she called for Linda was during the last school term; that she didn't go in the house, just stopped in the driveway. She stated Linda went with her a number of times. She gave this testimony:
"Q. All that occurred before her father was remarried? A. Yes, sir."
On cross-examination she stated she didn't know how many people lived in the home and then she gave this testimony:
"Q. * * * That home is in a very nice neighborhood, is it not? A. I think so.
"Q. It is a well-kept place, isn't it? A. I believe so.
"Q. Nicely painted, papered. Have you been inside of it? A. Yes, sir, I have.
"Q. It is immaculate inside? A. It is nice inside.
"Q. Mrs. Brake keeps everything just very nice? A. Lovely."
In answer as to whether or not she kept Linda clean and well dressed, the witness said, "not too well." She stated when she would pick her up after school she would be out playing and would not be clean every time, then gave this testimony:
"Q. And maybe her hands and little dress would be soiled because of playing. Is that what you mean? A. Well, I suppose that is why it was."
Mrs. Bruce B. Willingham testified she had a sister-in-law living two houses from where appellant's parents lived; that she visited her often and observed Linda going unsupervised about the neighborhood; that one morning, about 6:30 or quarter to seven, Linda was on her sister-in-law's porch with a coke and bag of potato chips and she stated she was eating her breakfast. She stated Linda was dressed in a pair of overalls and was dirty; that her ears were grimy, not from playing but just dirt ground in. She stated she had seen her a number of times unkempt. She stated that Mr. Brake was the only one who would come down and get Linda when she was at her sister-in-law's home; that Linda would be there at 7:30 in the morning, they would get her at noon, she would come back and stay until supper time, then come after supper and stay until 8:00 or 8:30. She testified she saw Linda at Grant Beach Park two years ago this summer; that no one was with her and she was absolutely dirty; that it was at night and the park is about three blocks from Linda's grandmother's. She also testified that her sister-in-law had a little girl about nine months younger than Linda. She testified she had washed Linda's face and combed her hair a number of times; that she was usually dirty and allowed to roam the neighborhood unsupervised. She testified that Linda had no table manners. She wouldn't say "please" or "thank you" nor bow her head when her little niece said her prayers.
On cross-examination she testified that the time she had seen Linda was in 1948, the first year she was in school and, when asked if that wasn't before the divorce, she stated that it was after the divorce, between November and June.
*793 This was all of the testimony offered in behalf of respondent.
Appellant offered 15 witnesses, 13 of them not being related to appellant.
The first witness was W. E. Dowell, Minister of the High Street Fundamental Baptist Church. He testified that Linda, her father and her grandparents were members of his church; that he baptized them. He stated he had been in Linda's grandparents' home and they were very fine, religious people. He stated it was his opinion they were regular attendants at church and that Linda came when she was in their home. He stated that the home, itself, was well kept; that he never knew of any misbehavior on the part of any of them.
On cross-examination he was asked about the good morals and good reputation of respondent. He testified he couldn't answer the question properly, not because he was not acquainted, but because various things he had heard had not been substantiated to him.
Margaret Brown, principal of West Port School, formerly principal of Weaver, testified she had known Linda since she started to school, which was in Weaver, in the first and second grades. She stated she saw her most every day; that she was always well dressed and clean when in school; that her grandfather brought her and came after her. She stated the child was well behaved, minded well and that her conduct was exemplary. Her exact words were, "She is a lovely child." She stated her grandparents seemed to be much interested in her. She testified Linda made good grades in school and she identified her report card. This card showed Linda made "S" in each of the subjects taught her. The last notation on the card states: "Linda has worked hard and did her best. She is promoted to Fourth Grade."
Mrs. Russell Parks testified she had known Linda and the Brake family for three and one-half years; that she has been in their home a number of times. She stated she was a friend of Mrs. Brake's daughter. She testified the grandparent's home was immaculate, nicely painted and in good repair. She used these words: "It is as clean as could be." She stated she had seen Linda frequently, talked with her and that Linda had been in her home. She testified that Linda was kept clean. She stated she had seen her several times the last two years at her home and in the park; that she had never seen her in Grant Beach park alone. She stated she had a little girl in a wheel chair and Linda was interested in the chair; that she would come around and see it and that either her grandfather or her Aunt Maude was always with her. She stated every time she saw Linda she was always clean and the only time she ever saw her dirty was when she was a tiny child in the possession of her mother. She testified that appellant's father and mother were religious people, attended church at the Fundamental Baptist Church; that she was not a member of that church. She stated she had never seen anything that indicated that Linda was neglected in any way after the divorce; that she was of the opinion that Linda had nice manners, using her exact words, "courteous and nice little girl."
Kathleen Ball testified she was Linda's Sunday School teacher at the Fundamental Baptist Church for about a year and half, until she was promoted; that Linda had been in her home. She stated that Linda was an outstanding member of the class, well known for her alertness, cleanliness and well-groomed, and that she was a well-behaved child in every way, using her words, "Her manners were perfect. * * * Her table manners were perfect. * * *." She testified Linda was never disobedient. She stated she could not recall a Sunday that Linda missed Sunday School because of ill health. She stated her father or grandparents would bring her; that they were good people and lived in a good neighborhood.
Mrs. A. C. Reynolds testified that she attends church at High Street Fundamental Baptist; that Linda came into her Sunday School class about three months before school vacation, 1949. She testified Linda was obedient, never appeared ill-mannered and that she never saw anything that indicated Linda did not have proper home *794 training. She stated she had been in Linda's home and that Linda just sat and listened. She testified Linda was clean, her hair well groomed and that she never saw her when she was not clean and properly clothed. She stated Linda was courteous and polite to her playmates and to adults.
Mrs. C. E. Greener testified that she lives at 611 West Lynn, next door to Linda's grandparents and has lived there for three years. She stated she had known the Brakes for ten years and Linda practically all her life. She testified Linda came to her home and played with her little niece; that she had kept Linda quite often; that Linda would spend the day there and sometimes a full week. She testified that Linda was clean at all times. She never saw her dirty. She stated Linda's clothes were very nice; that she was well behaved and very polite. She stated Linda never refused to mind. She stated she took Linda down to the farm on three different occasions and kept her all day and that she never observed any rudeness on her part. She stated she had been in the Brake home and that it was kept spotlessly clean and well arranged, using her words, "just a nice, lovely home." She stated the home was a two-story house and well furnished. She stated she knew the Brakes and appellant; that they were lovely, Christian people and very good neighbors. She gave these words, "She is a very well-disciplined child." She stated she didn't know how many people were in the Brake home but thought five or six.
Mrs. Ben Matlock testified that she was Children's Supervisor of Grant Beach Playground and had been for four years; that they have swings and other things for children to play with. She testified she supervised children under six and knew Linda Brake. She stated that during the four years she supervised the park playground, Linda's aunt brought her there a lot; that they talked while Linda played. She testified she never knew of Linda coming alone; that someone always brought her and came for her. She testified that Linda was always well-clothed; that her behavior and manners were nice and she never saw any rudeness on her part.
Mrs. Eula Gehrs testified that she lives at 700 East Elm and has known appellant's wife, Chloe Brake, since 1945; that she lived in an apartment at her home. She stated that appellant and his wife were satisfactory renters, were quiet; that she knew James Brake before he was married and his demeanor was always proper. She testified she worked but that Linda had been there at night since she came back from Albuquerque. She testified the apartment was in a good neighborhood, well equipped and clean; that it has a kitchen, large living room, small hallway, large bedroom and bath. She testified that the Brakes told her they were going to be married and asked her if she objected to Linda living with them; that she offered them an extra bed but was told they were purchasing a roller bed that they could put in the closet; that the Brakes are courteous and polite, nice people. This witness testified she only knew, of her own knowledge, that Linda had been with her father one night since the marriage and that was because she worked.
Mrs. M. H. Smith testified that she lived at 601 West Lynn, three doors from the Brake residence. She stated she had known the Brakes quite a while before Linda came on the scene and got well acquainted with them. She testified she had some grandchildren who stayed with her a year and three months while Linda was at her grandparents; that Linda played with them quite often in her back yard. She stated her husband put up a swing and a sandbox and a lot of things for the children to play with. She testified when Linda came down in the morning she was always clean; that after they would play in the sandbox she would get soiled, as did her grandchildren, and when asked about her manners, stated that she never saw anything wrong with her; that she was a very sweet little girl. She stated Linda had a bicycle and the children would take turns at riding it and there never was any trouble. She testified the Brake home was in a nice neighborhood, nice around the house and yard and was a good place to raise children. She stated she never saw anything that *795 would indicate any wrongful home training on the part of Linda.
This witness testified that she conducted a Bible-Story Hour, once a week, on Friday after school; that Linda started coming to it at the age of six and had been coming ever since; that she was always properly dressed and clean and her behavior was good.
Mrs. Myrtle Tindall of 638 West Lynn testified that her home was the fourth house from the Brake home. She stated she had known the Brakes for two and one-half years; that she knew James and his parents; that they are lovely people and live in a good neighborhood. She stated they were a religious people, refined. She stated she knew Linda and saw her frequently playing around the place; that Linda had been in her home and when asked if Linda was clean or filthy and dirty, gave this answer, "Linda has always been clean. I have never seen her yet when she was neglected-looking or dirty. * * * I have never seen a thing wrong with Linda. Her deportment and conduct and manners, and everything, has been perfect around our home." She stated she had a little nephew who lived with her and that Linda played with him in her yard; that she was always well mannered. She testified she had been in the Brake home, which is a lovely home, well kept inside and out; that the Brakes are a quiet people and good neighbors.
Mrs. Roxie Ragsdale of 629 West Lynn, testified that she lives the second door from the Brakes; that she has a daughter, 11 years old, named Shirley Ann; that she and Linda played together very frequently. She stated all children get dirty after they play but that she never saw Linda dirty and when her grandfather would take her to school she was always nice and clean; that they often stopped by and took her daughter with them too. She stated she never saw Linda when her scalp was dirty or when she seemed to be unkempt. She stated they commented on how well mannered Linda was for her age; that one day when she had company Linda was there and she offered her a piece of cake and Linda said, "No, thank you, I have had dinner"; that she insisted on her having a piece anyway and when she got through, she excused herself and left. She stated she had known Linda about four years and that she was courteous, polite and obedient. She stated the children would ride around the block on Linda's bicycle but were never allowed to go across the street. She testified she never knew of Linda going to the park alone. She testified that her grandmother gave a party for the child in the park but she never was there alone. She testified Weaver school was about three blocks from the Brake home; that Linda had been going to Weaver school for about two years and that her grandfather would usually go after her. She stated the Brake home was immaculate, well furnished and decorated inside. When asked if she had seen anything that would make it a place undesirable for a child to be raised, she stated, "No, sir." She testified the Brakes were good Christian people; that they attended the High Street Fundamental Baptist Church and that Linda went there too. She specifically testified she never saw Linda running around the streets, park or any place else by herself. She testified that since Linda had returned from her mother's September, this year, she saw her father taking her to school one morning; that she had seen her around in the neighborhood every evening; that Linda went to her grandmother's at noon for lunch. She stated Linda was no longer at her grandparents at night and that had been the condition for two or three weeks. She stated that Linda would usually come and play with her daughter but for the last two weeks she had not been there. She testified she had never heard anything about Linda and the Tindall's daughter as testified to by respondent. She stated the Tindalls were a nice family and well thought of.
Mrs. Tom Gregory testified that she lived at 608 Cherry Street Court. She was well acquainted with the Brakes and had been for twenty yearsthe grandmother and James; that she had visited in and out of their home, not every week but periodically. She stated they were very fine Christian people; that she had been in their home often and she gave this answer, "It is a *796 very fine, modern home; plenty of room." She stated it was very neat and clean. She stated she had known Linda since she was born; that she was a well-behaved, perfectly normal child; that she seemed to be happy and well satisfied. She stated she had never seen anything to indicate that she was not properly reared or properly trained and she thought Linda was getting very good care where she is.
Mrs. William Brake, the grandmother, testified that she lives in a modern, eight room home with bath, water, lights, furnace and everything and that it is in a good neighborhood. After this testimony respondent's attorney stated there was no issue about the home. She testified there were five people living in the homeher sister, two sons, her husband and herself; that there were five bedrooms in the home; that she and Linda slept in the hall, which had a large window and was furnished. She stated that since Linda came home she wanted to go with her daddy. She gave this answer: "Of course, I have had her the last two years since the divorce, and I had her the year before the divorce. I kept her in private school across the street when she was five. And after that, after the divorce, of course, I kept her the rest of the time."
She testified appellant lived with her and Linda; that Linda was in charge of her father while living with her. She stated appellant married July 18th; that Linda, at the time, was in Albuquerque with her mother; that Linda had just been back since September 10th and, since that time, has lived with her daddy and stepmother at 700 East Elm. She testified that she and Linda arrived from Albuquerque on Sunday morning; that Linda's father and stepmother were out of town and Linda spent the night with her that night; that the next morning they came after Linda and she went with them. She stated that last night Linda stayed with her. She stated Linda had been at 700 East Elm the biggest part of the time since she returned home. She testified that Linda enrolled in Weaver school because her father planned to move over in that district; that her father enrolled her there. She testified while Linda was with her she took her to church and Sunday School and that Linda's father attended the same church; that they were all regular attendants at church. She testified she knew her son and daughter-in-law had attempted to get a place in the Weaver School District; that appellant's wife works at the Telephone Office; that she goes to work in the morning at 7:00 and works until 11:30 and in the afternoon from 4:00 until 7:00. She stated when her son was home he brought Linda to her home to go to school or took her to school himself; that when he was not at home, appellant's wife would bring Linda over before 7:00 in the morning and come after her in the evening after school; that Linda has lunch with her. She stated that appellant's wife was off work two days each week and would take Linda directly to school and come after her at 3:30 in the afternoon. She testified that her son had Linda take dancing lessons and that she was in a recital. She stated they had endeavored to give Linda every advantage a child could have. She testified she had always kept Linda and her clothes clean all her life; that she never allowed her to go dirty and upkempt. She stated, of course, when the child was out playing, making mud pies, etc., she would get dirty but that she was kept as clean as any other child in the neighborhood.
She testified Linda was never allowed to run wild and loose up and down the streets without supervision nor allowed to go to the park alone at night or in the daytime. She testified that it was not true what Mrs. Willingham testified to about Linda being on her porch one morning dirty, etc. She stated Linda slept until about 7:00 or 7:30 and that on school days she got up at 7:00.
She testified Linda's table manners were good and she always says, "please" and "thank you" and excuses herself when she leaves the table; that when she walks in front of anyone she always says, "excuse me." She stated she never whipped Linda and never had any trouble disciplining her and never heard her belch at the table nor did she refuse to eat what was on the table. She stated she always prepared Linda a *797 well-balanced meal. She testified Linda had never said anything to her about being her own boss. This witness testified she had taken Linda to the doctor twice for kidney trouble; that for a while she wet the bed; that the doctor said she had a nervous condition that made her do that. She stated Linda had not been bothered for some time prior to going to Albuquerque. She denied that she posted Linda what to say to her mother over the telephone. She stated that when respondent called on the phone she told her that Linda had gone down to Virginia's and did not tell her that Linda was down the street. She testified that respondent went to work at 5:30; that Mr. Johnson and Linda would take her to work and would pick her up at 12:00 or 1:00 at night; that he would take Linda in her gown to pick up her mother; that that was in 1949, when they were both working. She testified about going after Linda in September, 1950; that respondent and her husband did not meet her bus; that she went out the next morning in a cab and that respondent and her husband took her and Linda back to the hotel; that respondent didn't get out of the car but her husband carried the bags into the door and said to Linda, "I will see you, Linda." She testified that respondent told her that she and her husband had had a few words over Linda wetting the bed. She stated they said grace at the table; that Linda bows her head and says her prayers every night. She testified that while Linda had been in her home she had looked after her welfare both physically, intellectually and spiritually and that Linda's father had likewise done so. She stated there had never been any trouble between her and respondent.
James Brake, appellant, testified that at the time of the divorce, respondent lived in Kansas City; that she came back to Springfield for the divorce and, thereafter, moved to St. Louis and from there to Albuquerque. He stated they went before Judge McLaughlin to get permission for Linda to spend the holidays in Albuquerque; that the court stated it would be all right but told respondent to have Linda back a week before school started.
He testified that respondent came for Linda in 1949, the last of June or first of July and kept her until the 15th of August; that she brought Linda back to Oklahoma City, where he met her. He said respondent had written that she could not get enough time off to bring Linda to Springfield. He stated everything had been agreeable as to Linda's custody. He testified that respondent told him she was working at the Airport in 1949; that she was married and Skipper was taking care of Linda while she worked. He testified he was engaged in driving a Greyhound bus; that after everything was taken out, his check was $55 or $60 a week. He stated his last check for two weeks was $184.00 before any take-outs were allowed. He testified he was off two days in each two weeks; that sometimes he would leave Springfield and go out and come back the same day and sometimes he was out two days.
He stated his wife worked at the Telephone Company, going to work at 7:00 in the morning and works until 11:30 and from 4:00 until 7:30 in the evening. He testified when he was in town he took Linda to his mother's to go to school; some mornings he took her to school. He stated when he was not in town his wife took Linda and when she was off from work did not take her to his mother's. He stated his wife was off work two days in each week.
He testified he put Linda in Weaver school because he was planning to move to that district; that he had tried to get a place in that district before Linda got back from Albuquerque. He stated he saw Mr. Study of the Weaver school, explained to him the circumstances, and got his consent that Linda go to Weaver.
He stated that before his marriage he had never seen Linda dirty except when she was playing; that she never went to bed dirty. He stated they didn't allow Linda to go about the streets or to the park without supervision, in daytime or at night.
He testified Linda had good table manners and was courteous and polite; that she would mind well and there never was any difficulty in disciplining her. He stated *798 he told Mrs. Bonser that Linda was down the street when she called; that Linda, at the time, was at Mrs. Ragsdale's. He testified he didn't know of the motion to modify until one morning Mr. Lincoln called him after he got in, two days before he was served with notice.
Mrs. James Brake testified that she and appellant were married July 18th; that prior to the marriage she had known him about a year and had often been in the home of his parents. She testified that Linda had been well kept and cared for; that the Brakes were very kind and helpful; that Linda was happy with the grandparents before the marriage; that she was kept clean and her table manners were nicer than most children.
She stated before Linda returned from Albuquerque, she and appellant had made plans where she should go to school, had seen about an apartment in the Weaver district. She corroborated her husband's testimony as to the days and hours they worked. She stated when she worked, she took Linda to her grandmother's about a quarter to seven; that Linda had had her breakfast and was ready for school; that she went after her about 8:00 on work days. She stated when her husband was off he took Linda to school.
She stated they lived in a three room apartment, modern with bath; that they had purchased Linda a bed before she had returned. She testified Linda was never dirty and filthy prior to their marriage or after their marriage. She stated Linda had been with her grandparents possibly three or four nights since their marriage. She stated that if it were necessary for her to stay home to keep Linda she would be willing to quit her job; that she would assume the responsibility of a mother, and look after the physical welfare and care of Linda, her education and her spiritual training.
She testified she was a member of the Selmore Baptist Church at Ozark, Missouri. She stated she would see that Linda stayed in Sunday School and Church.
She stated her wages were $46 a week; that she and her husband put their money in a joint account and both checked on it.
An analysis of the testimony shows that respondent has remarried since the divorce; that she has moved out of the jurisdiction of the trial court, who granted the divorce and custody of the child, and now lives in Albuquerque, New Mexico; that her husband is a Chief Petty Officer in the U. S. Navy, permanently stationed at Albuquerque unless war should break out with Russia or the circumstances change so the government would need his services at other places.
The testimony shows that respondent had no home of her own at the time of divorce but that she and her present husband now possess a six room, modern home, furnished, and own an automobile. Respondent's testimony further shows that she was employed at the Airport in Albuquerque until she became pregnant and that she expects a baby in January, 1951. It is undenied that her husband earns $388 a month and is financially able to support respondent and give to this minor child proper educational advantages.
The testimony shows that appellant remarried and Linda's home has probably changed since she filed her motion to modify. At least, respondent says that Linda has not been at her grandmother's as much since the filing of the motion as before. The testimony shows that appellant's wife is employed.
We find these to be the changed conditions relied upon by respondent to justify the trial court's judgment modifying the divorce decree.
We further find from the record evidence, set out in this opinion, at length, that, prior to the separation of respondent and appellant, respondent worked and placed the custody of her child with appellant's mother, where it had been a year before the divorce. Respondent does not contend that appellant's mother's home was not a fit place for the child at that time. The evidence is undisputed that the grandmother placed the child in a private school and gave it every advantage, both educationally and morally, that could be given a child. Respondent had a married sister living in Springfield, Missouri, at the time and had a father and mother living on a farm nine miles out of *799 Kansas City, yet she never asked her people to take the child but voluntarily placed it in the care of appellant's mother.
Respondent's testimony shows that, at the time of the divorce, she agreed that custody of the child be placed in appellant, provided it be kept at his mother's home while he lived there. Again, respondent recognized the fitness of the home of appellant's parents to have the custody of her child. The testimony is undisputed that, after the divorce, appellant kept his child at his parents' home, where he lived; that this grandmother, who is now 61 years old, placed the child in a Bible-Story class, conducted in a neighbor's home, on each Friday, which class the child has attended to the present date; that her father gave her dancing lessons and had her in a recital; that Linda attended Weaver school during her first two years. There is no contention that Weaver is not an up-to-date public school. She has made good grades, as shown by her grade card, making "S" in each of the subjects taught. There is no denial that the father and his parents kept Linda constantly in church and Sunday School and that she has had the very finest of educational and moral training from the date of the divorce until the present time.
Respondent just doesn't attempt to deny any of this testimony. Then what does respondent rely upon to have the custody of this child changed to herself?
She first testified that Linda's table manners were not good and she bases her judgment as to this upon the sole ground of having her six weeks, during vacation time in 1949, and one Christmas vacation, and during the vacation in 1950, from June 10th to September 1st. The testimony on the part of respondent's husband is so weak on this line as to not be persuasive. He testified that Linda was brilliant, kind, and really could be something. Linda's training that caused her to be brilliant and kind and lovely was obtained while in the custody of her father, the appellant.
Respondent's husband testified that there was not much wrong with Linda. He states she was brilliant, but needed a little straightening out; that her habits are bad. She wet the bed one time and, he states, he corrected that by talking to her. Now, as opposed to respondent's testimony regarding Linda's table manners, based upon the short time she was in the home of respondent, during vacation periods of 1949 and 1950, we have the testimony of Linda's Sunday School teachers, of her school teachers, of the supervisor of Grant Beach Park, of Linda's next door neighbors, with whose children Linda played and who had the opportunity to observe her when she was in their home and playing with their children and who visited in the home where Linda lived and had the opportunity to observe the conditions under which she was being trained, all testified that Linda's manners were perfect as any child's manners could be; that she was considerate and that there never was any evidence to indicate that she was not being properly trained as to such table manners. The evidence is so plain and convincing that Linda's table manners were good that this court could not find otherwise.
What else does respondent complain about? She says that Linda did not want to eat well balanced meals; that she belched at the table and tried to bargain with them as to what she should eat. This testimony just fades out when compared to the great mass of testimony offered by fifteen witnesses on the part of appellant that Linda never objected to the meals prepared for her; that they were always wholesome and well balanced and that Linda has always been an obedient and well mannered child at the table; that she says her prayers and has never been lacking in discipline. We think that this testimony on the part of respondent is so weak as to wholly fail to meet the burden of proof required to establish that Linda did not have proper training as to table manners.
Respondent testified that she found Linda in the bathroom with some little girls with parts of their clothes off. It must be borne in mind that respondent is an interested party and is making a desperate effort to secure the custody of her child. There is no testimony, we think, to justify the trial court in making any other finding than Linda's morals have been carefully looked *800 after by appellant since the divorce decree, both at the home of appellant's parents and at appellant's home since appellant's marriage.
As to the one instance of the child wetting the bed, we think the testimony is so ridiculous as to be completely ruled out. Respondent knew that Linda, while a child, had had this trouble and had medical attention furnished, not by her, but by the grandmother and appellant. Under the evidence Linda had had the most careful attention as to her health.
In respondent's brief she makes some reference to the fact that appellant lives in a three room apartment and is a bus driver and that appellant's wife works at the telephone office. This argument is made for the purpose of showing respondent is in a better position to care for her child.
When the trial court awarded the custody of Linda to appellant, he was then employed in the same position that he is now employed. The trial court found that Linda's welfare was safe in the hands of appellant under those conditions. There can be no question from the evidence that the income of appellant is sufficient to care for his child and that she is being properly cared for by him. Respondent does not attempt to show that appellant is not of good moral character, industrious; she does not attempt to show that Linda is not now being kept in a good school where she has been since she started to school her first year. She does not attempt to deny that appellant is a church member and his wife is a church member and that they take Linda to Sunday School and Church. Respondent does not attempt to say that Linda does not live in a good neighborhood or that her surroundings, while in custody of appellant, are such as to require a change of the custody.
Respondent offered one witness, besides the family, who testified that while she was visiting her sister-in-law in Springfield, in 1948, she observed Linda many times and she was dirty and filthy and was allowed to go to the park and about the streets unsupervised in a dirty and filthy condition. This testimony was not corroborated by anyone. Respondent's mother even testified that Linda's grandparents kept a home that was immaculately clean. When asked if Linda was not always well dressed and clean she stated, "Not too well." She then testified that she would pick Linda up after school, when she would be out playing, and take her to her home and keep her over the week end and that at times her dress would be soiled because of playing. She stated that is what she meant when she said she was not too clean. But we think the testimony is so convincing that Linda was always kept clean and well dressed and never permitted to go about the streets or to the park unsupervised that the court would not be justified in giving any weight to Mrs. Willingham's testimony. Mrs Willingham, herself, admitted she was a married woman with a family and spent most of her time with her sister-in-law.
We find that respondent has wholly failed to meet the burden of proof to establish that the minor child, since the divorce action, has not had the best of care and attention. We are impressed by the fine motherly care given this child by appellant's mother and the kindness shown by the grandfather; the fine supervision afforded this child while in their home. We find from the record that the appellant has never neglected his child in any way but has given her the finest advantages a father could give his child. This record shows the child has been well trained as to her manners and her discipline.
We think the record shows that Linda is in the custody of her father and stepmother and has been since her return from the last vacation with her mother, to-wit, the first of September, 1950. The evidence that she is in Weaver school in no way shows otherwise. It is only natural that the father would want to keep his child in the school where she first started; where the evidence shows she has had such good training and has made such fine advancement; where she could go to the home of his mother for lunch. What court would consider that wrong? Is there any doubt that this grandmother and grandfather love this child? They have had the training of her almost all of her life and the father would certainly *801 be ungrateful if he would refuse to let his baby visit its grandparents a part of the time under the facts in this case.
We agree with the law as set out in the cases cited under the different points and authorities by respondent. There is no question that only changed conditions since the divorce can be considered, which changed conditions must be shown as a prerequisite to the granting of the decree of modification, but the showing of the changed conditions will not alone warrant a modification of the original decree. It must be shown that the best interest of the child requires that its custody be changed. The proper rule of law is declared in Schumm v. Schumm, supra [223 S.W. 126]: "A provision once made becomes as conclusive as any other order or decree, and can only be modified on a showing of subsequently changed conditions. However there is this to be borne in mindthat while proof of a change in conditions is a prerequisite to the modification of a decree, such proof does not necessarily require a modification, and no modification will be made unless the welfare of the child itself requires a change in the provisions for its custody. Irvine v. Aust, Mo.App., 193 S.W.2d 336."
Under point II of respondent's brief, she states that the findings of the trial court on the motion to modify should be allowed to stand unless in clear conflict with the preponderance of evidence disclosing a manifest abuse of judicial discretion, especially where the facts are in dispute.
There is no question that is the law, but the evidence in this case is such that we find that the decision of the trial court is in conflict with a clear preponderance of the evidence and that his judgement is a clear abuse of judicial discretion.
So, under point III, the custody of a minor child of tender years will be given the mother, other things being equal, but, under the facts in this case, other things are not equal.
Under point IV, we hold that the best interest of the child would not be served by the taking of this minor child from the custody of where the trial court placed it, and transferring it out of the jurisdiction of the court where the court would be powerless to enforce its protective decrees. It is against the policy of the court to transfer a child outside of its jurisdiction unless it is clearly shown that the best interest of the child so requires and the burden of proof is upon respondent to show by evidence the best interest of the child would be so served. She has wholly failed to meet that proof.
We have no objection to the law as stated under point V, but under point VI, we wholly disagree that the facts in the case warrant a modification of decree as to the custody of this child. Respondent relies upon Keith v. Keith, Mo.App., 95 S.W.2d 669, as being a case in point on this proposition.
An examination of that case shows that the minor child was granted to the plaintiff by a default judgment; that plaintiff was crippled, had no home in which to keep the child and could not earn sufficient money for its support; that the defendant, the child's mother, was unable financially to attend the trial or to care for it, being twenty years of age and wholly dependent upon her friends for her support. The testimony shows that since the divorce she married a man who held a responsible position in a responsible company, who possessed a nice five room home and earned sufficient money to care for his wife and the minor child. The testimony further shows that the mother was of good moral character and a proper and fit person to have the child and the father was wholly incapable of properly caring for it. How different from the case at bar. There was not a default judgment. Respondent was able to defend the case and was present in court with her attorney when the divorce was granted; had filed an answer and cross-bill and was charged with associating with another man. Her moral fitness to have the child was an issue, yet, in this action to modify, there is not any evidence to show the moral fitness of respondent as was in the Keith case. In the Keith case the evidence showed the husband, plaintiff, was *802 crippled and without a home or the ability to maintain a home for his child and properly care for it. In this case, the evidence is undisputed that appellant is providing a home for his child, is earning sufficient money to care for it and is actually giving it the very best of care.
There is something more. In the case at bar respondent's testimony shows that respondent's husband is a soldier, subject to being taken by the government in case of war from his home and family. Respondent is expecting a child. They are living far from the home where she was reared and there is no contention that respondent could earn sufficient money by herself to support this child. Under present conditions the court cannot close its eyes to the threats of an immediate war and, for that reason, we think that the trial court's judgment in modifying this decree is wholly wrong. The best interest of this child would not be served by taking it from those who have so tenderly nourished it and cared for it and trained it, from the school where it has spent all of its school days and from the town where both the grandparents on the mother's side and the grandparents on the father's side live, to put it in a strange state where the provider for the home is likely to be engaged in war.
We think under the authorities cited under point VI of appellant's brief, to-wit: Hensley v. Hensley, Mo.App., 233 S.W.2d 42; Garvey v. Garvey, Mo.App., 233 S.W. 2d 48, and other cases therein cited, that the trial court in this case abused its discretion in awarding the care and custody to respondent.
Judgment reversed and remanded with directions that judgment be entered denying respondent's motion to modify.
VANDEVENTER, P. J., not sitting.
BLAIR, J., concurs.